IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Elyse D. Jenkins, | ) | C/A No.: 1:16-1237-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.  Relevant Background

A.  Procedural History

On March 15, 2013, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on January 21, 2013. Tr. at 207–13 and 214–19.

Her applications were denied initially and upon reconsideration. Tr. at 115–19 and 125–30. On October 16, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 35–63 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 17, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 18–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 4–9. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 21, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 38. She completed high school and two years of college. Tr. at 39. Her past relevant work ("PRW") was as a customer service representative, a social services interviewer, and a daycare worker. Tr. at 56. She alleges she has been unable to work since January 21, 2013. Tr. at 207.

2.    Medical History

On January 21, 2013, Plaintiff was transported to the Medical University of South Carolina ("MUSC") after being injured in a motor vehicle accident ("MVA"). Tr. at 317. She sustained a broken left leg, a broken left arm, a left ankle dislocation, an injury to an artery in her left leg, and a concussion. *Id.* She underwent open reduction and internal fixation ("ORIF") of a left radius fracture, irrigation and debridement of a left leg laceration, ORIF of a left tibial plateau fracture, and closed treatment without

manipulation of a left subtalar dislocation. *Id.* During her hospital course, Plaintiff was evaluated for a traumatic brain injury, but underwent a full cognitive evaluation and was found to have no deficits. Tr. at 423. She was discharged from MUSC on January 29, 2013, with instructions to bear no weight with her left arm or left leg; to wear a cervical collar at all times until follow up; to avoid driving or operating machinery while taking narcotic medications; to transfer from her bed to a wheelchair; and to continue taking aspirin for popliteal artery narrowing. Tr. at 317, 320, and 423.

Plaintiff followed up with Jeremy J. Ackermann, D.O. ("Dr. Ackermann"), on February 13, 2013. Tr. at 331. Dr. Ackermann noted that Plaintiff was immobile and non-weight bearing. *Id.* He stated a computed tomography ("CT") scan showed Plaintiff to have a lingular nodule in her lung. *Id.* Plaintiff reported anxiety and depression. *Id.* She described her mood as "down" and her energy as decreased. *Id.* She stated she was worried about everything, crying regularly, and experiencing flashbacks. *Id.* She complained of headaches and pain in her left arm and leg and right lower leg. Tr. at 331–32. Dr. Ackermann assessed a lung anomaly, closed fractures of the tibia and radius, and mixed depression and anxiety. Tr. at 332. He prescribed Citalopram Hydrobromide for depression and indicated he would refer Plaintiff for another CT scan in three to four months to confirm that the nodule was stable. *Id.*

Plaintiff presented to Gabrielle L. Poole, P.A. ("Ms. Poole"), at MUSC Health on February 15, 2013. Tr. at 430. She reported a lot of pain, and Ms. Poole observed her to be non-weight bearing on her left arm and leg. *Id.* Ms. Poole removed splints from Plaintiff's left ankle and wrist. *Id.* She noted Plaintiff's incisions were healing well and

3

that she was neurovascularly intact. *Id.* She continued Plaintiff's use of a hinged knee brace and placed her in a short leg controlled ankle motion ("CAM") boot and a short arm cast. *Id.* She instructed Plaintiff to remain non-weight bearing, referred her to physical therapy, and instructed her to work on range of motion ("ROM") of the knee and hand. *Id.* She indicated Plaintiff was to remain out of work until her next office visit. Tr. at 430 and 452.

On March 8, 2013, an x-ray of Plaintiff's left wrist showed no evidence of hardware complication or failure, but indicated no significant interval healing. Tr. at 376. An x-ray of her left leg showed partial interval healing and no evidence of hardware failure or complication. Tr. at 377–78.

On March 12, 2013, Plaintiff followed up with Nancy Morgan Miller, P.A. ("Ms. Miller"). Tr. at 432. Ms. Miller observed Plaintiff to have some swelling in her left proximal tibia, knee, ankle, and wrist. *Id.* She indicated Plaintiff was neurovascularly intact in her left upper and lower extremities, but was very tender to palpation of her left wrist. *Id.* She fitted Plaintiff with a wrist brace. Tr. at 431. She removed Plaintiff's short ankle cast and replaced it with an air stirrup brace. *Id.* She indicated Plaintiff could be full weight bearing as tolerated with her left upper extremity and 50% weight bearing with her left lower extremity for the next two weeks. Tr. at 432. She stated Plaintiff should remain out of work. *Id.*

Plaintiff followed up with Ms. Miller on April 19, 2013. Tr. at 433. She complained that her left ankle would swell if she stood on it for any period of time. *Id.* She also reported pain in her left wrist. *Id.* Ms. Miller observed Plaintiff to have minimal

swelling in her left wrist and decreased ROM with supination and pronation to a lesser extent. *Id.* She noted Plaintiff continued to ambulate with a mildly antalgic gait using one crutch. *Id.* She indicated Plaintiff had some continued swelling in her left lower extremity, but had full extension of her left knee and good left ankle ROM. *Id.* She instructed Plaintiff to bear weight as tolerated and to continue to wear an Aircast splint on her left ankle as needed. *Id.*

Plaintiff presented for an initial physical therapy evaluation on March 19, 2013. Tr. at 339. She reported that her pain was most severe in her left ankle and knee. *Id.* The physical therapist noted that Plaintiff was in a wheelchair, but had crutches and was 50% weight bearing. *Id.* She observed Plaintiff to have active ROM of her left knee from -10 to 100 degrees, passive ROM of her left knee from -5 to 110 degrees, left ankle dorsiflexion to 0 degrees, left ankle inversion to 5 degrees, left ankle eversion to 5 degrees, and left ankle plantar flexion to 45 degrees. *Id.* Plaintiff demonstrated 3-/5 quad strength and 3+/5 ankle strength. *Id.* Plaintiff had left knee circumference of 56 centimeters and right knee circumference of 54 centimeters. *Id.* Her midpatella circumference was 45 centimeters on the left and 44 centimeters on the right. *Id.* The physical therapist indicated that Plaintiff was to remain 50% weight bearing until March 22, but was to progress as tolerated thereafter. *Id.* She stated Plaintiff's goals for therapy were to be independent with her home exercise program; to be walking with a normal gait and without an assistive device; to have 4+/5 or greater strength in her left lower extremity; and to have minimal to no edema. *Id.*

On March 26, 2013, Plaintiff reported to her physical therapist that she had not been doing the home exercises. Tr. at 345. The physical therapist noted that Plaintiff's ROM was increasing, but that Plaintiff continued to report pain with passive ROM. *Id.*

On April 12, 2013, Plaintiff complained that her left ankle was making it difficult for her to walk. Tr. at 338. The physical therapist noted that Plaintiff was making slow progress because of inconsistent attendance and questionable compliance with her home exercise plan. *Id.*

On April 19, 2013, an x-ray of Plaintiff's left leg showed stable plate and screw fixation and evidence of interval healing. T.r at 373–74. An x-ray of her left wrist showed stable plate and screw fixation with no hardware complications, but minimal interval healing. Tr. at 373. Plaintiff complained of ankle swelling that occurred when she was on her feet for any period of time. Tr. at 447. She also reported pain with supination and pronation of her wrist. *Id.* Ms. Morgan observed Plaintiff to have decreased ROM and minimal swelling in her left wrist. *Id.* She stated Plaintiff had full extension of her left knee and 110 degrees of flexion. *Id.* She observed some swelling in Plaintiff's left lower extremity. *Id.* She noted good ROM, but some tenderness and swelling in Plaintiff's left ankle. *Id.* She instructed Plaintiff to continue to bear weight as tolerated with her left upper and lower extremities and to use the Aircast splint as needed. *Id.* She indicated Plaintiff should continue to receive physical and occupational therapy and should remain out of work until her next evaluation. *Id.*

State agency medical consultant William Cain, M.D. ("Dr. Cain"), completed a physical residual functional capacity ("RFC") assessment on May 30, 2013. Tr. at 70–73.

He indicated Plaintiff had the following restrictions: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently operate hand and foot controls with the left hand and foot; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; frequently perform gross manipulation with the left hand; and avoid all exposure to unprotected heights. *Id.* Lisa Mani, M.D. ("Dr. Mani"), assessed the same restrictions on October 26, 2013. Tr. at 96–99.

Dr. Ackermann completed a mental status form on June 3, 2013. Tr. at 436. He indicated Plaintiff's diagnoses to be depression and anxiety. *Id.* He stated he had prescribed Citalopram, but was unable to assess the effectiveness of the medication because Plaintiff had not followed up. *Id.* He described Plaintiff as oriented to time, person, place, and situation; having an intact thought process; demonstrating appropriate thought content; having a normal mood and affect; and showing adequate attention, concentration, and memory. *Id.* He indicated Plaintiff exhibited slight work-related limitation in function as a result of a mental condition. *Id.*

On June 5, 2013, state agency consultant Camilla Tezza, Ph. D. ("Dr. Tezza"), reviewed the record and completed a psychiatric review technique form. Tr. at 69–70. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and found that Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; mild difficulties in

maintaining concentration, persistence, or pace; and no episodes of decompensation that were of an extended duration. *Id.*

On June 20, 2013, a chest CT scan showed no change in the lingular nodule. Tr. at 444.

Plaintiff complained of anxiety, depression, discomfort in her left leg, and significant low back pain on June 26, 2013. Tr. at 441. She continued to report crying spells, irritability, and anxiety, but indicated her energy had slightly improved. *Id.* She indicated she was only taking Citalopram occasionally. *Id.* Dr. Ackermann observed Plaintiff to have bilateral paralumbar spasms and tenderness and slightly limited ROM secondary to pain. *Id.* He noted trace edema in Plaintiff's left ankle. *Id.* He prescribed Baclofen for muscle spasms and advised Plaintiff to engage in back stretching and strengthening exercises. *Id.*

On July 12, 2013, Plaintiff reported swelling in her left ankle and knee after sitting for a long period. Tr. at 445. She complained of left wrist pain with supination. *Id.* She indicated she was unable to care for her family or to do many of the activities she had done prior to the accident. *Id.* She stated she had been practicing typing in an effort to return to her job at the call center. *Id.* Ms. Miller observed Plaintiff to ambulate with a mildly antalgic gait and to use a cane. *Id.* She stated Plaintiff was tearful. *Id.* She noted Plaintiff had decreased ROM of her left shoulder with abduction and forward flexion. *Id.* She observed decreased supination and flexion in Plaintiff's left wrist. *Id.* She stated Plaintiff had left knee flexion to 115 degrees and lacked 10 degrees of full extension. *Id.* Plaintiff had minimal swelling in her left ankle and good ROM. *Id.* X-rays of Plaintiff's

left leg showed good alignment, stable hardware, and interval healing. *Id.* X-rays of her left wrist indicated good alignment, stable hardware, and a healed fracture. *Id.* Ms. Miller instructed Plaintiff to discontinue use of her left wrist brace and left ankle Aircast splint and to work toward ambulating without her cane. *Id.* She referred Plaintiff for additional physical therapy for her left shoulder, wrist, knee, and ankle. *Id.* Plaintiff's orthopedic surgeon Langdon A. Hartsock, M.D. ("Dr. Hartsock"), indicated Plaintiff should remain out of work pending a reevaluation in six months. Tr. at 450.

On September 25, 2013, Dr. Ackermann indicated that Plaintiff had continued to deal with injuries and to follow up with her orthopedist, physical therapist, and occupational therapist. Tr. at 448. He stated Plaintiff's providers had not identified a date for her to return to work and indicated her orthopedist would update her work status at the beginning of the next year. *Id.*

On December 20, 2013, Plaintiff reported she had recently discovered that her husband was cheating on her. Tr. at 463. She indicated her mood was down and depressed and that she had experienced crying spells, irritability, and anxiety. *Id.* She stated she was only taking Citalopram occasionally, but felt that it helped and that her energy level had slightly improved. *Id.* Dr. Ackermann noted Plaintiff had painful ROM of her right knee, but no obvious edema or calf tenderness. Tr. at 463–64. He observed Plaintiff to be mildly anxious and crying during the examination. Tr. at 464. He advised Plaintiff to take Citalopram as directed and referred her for counseling at Serenity Mental Health. *Id.* He discontinued Plaintiff's prescription for Lortab and replaced it with Acetaminophen-Hydrocodone Bitartrate 325-5 milligrams. *Id.*

9

Plaintiff presented to Stacey Rothwell, PA-C ("Ms. Rothwell"), for an orthopedic follow up visit on March 4, 2014. Tr. at 467. She reported left wrist weakness and severe muscle spasms in her left lower extremity. *Id.* She indicated her muscle spasms were disturbing her sleep and causing her to feel fatigued during the day. *Id.* She requested a referral for additional rehabilitation. *Id.* Ms. Rothwell observed Plaintiff to have some weakness with supination and 4/5 grip strength in her left upper extremity. *Id.* She noted Plaintiff had intact sensation and "essentially full" ROM of her left wrist. *Id.* She observed Plaintiff to have crepitus in her left knee; to be able to flex from zero to 120 degrees; to have decreased sensation along the lateral aspect of her incision; and to have 4/5 quad strength. *Id.* Ms. Rothwell indicated Plaintiff required additional rehabilitation to treat weakness in her left upper and lower extremities. *Id.* She recommended Plaintiff engage in aggressive therapy three days a week and practice home exercises between therapy visits. *Id.* She indicated Plaintiff should return in six to eight weeks for an evaluation and indicated they hoped to "release her back to work full duty" at that time. *Id.* She prescribed Flexeril, but advised Plaintiff not to take it in combination with Baclofen. *Id.* An x-ray of Plaintiff's left leg showed significant interval healing and no evidence of hardware failure. Tr. at 475. Dr. Hartsock indicated Plaintiff should remain out of work until her next visit in six to eight weeks. Tr. at 449.

Plaintiff presented to Hope Clinic for a second opinion regarding left knee and arm pain on March 29, 2014. Tr. at 454–55. The provider observed Plaintiff to walk with a normal gait and to have no edema or tenderness in her extremities or spine. Tr. at 455. He informed Plaintiff that it was not unusual for her to have the deficits she complained

of after such major surgery. *Id.* He prescribed Neurontin and instructed Plaintiff to follow up in one month. *Id.*

On March 31, 2014, Plaintiff complained of a severe frontal headache that was accompanied by nausea. Tr. at 460. She reported chronic pain in her left leg and wrist and requested a referral to physical therapy. *Id.* She stated she took Norco sparingly for pain and had not filled her prescription from December 2013. *Id.* She indicated she was seeing Jack H. Booth Psy. D ("Dr. Booth"), for depression and anxiety, but denied taking Citalopram regularly. *Id.* She endorsed symptoms that included a down and depressed mood, crying spells, irritability, and anxiety. *Id.* Plaintiff complained of pain with ROM testing of her right knee. Tr. at 460–61. Dr. Ackermann observed Plaintiff to have no obvious edema, no calf tenderness, and to be crying and mildly anxious during the examination. *Id.* He ordered a Toradol injection for Plaintiff's headache, referred her for physical therapy, and advised her to use Citalopram as directed. *Id.*

Plaintiff followed up with Dr. Hartsock on June 17, 2014. Tr. at 468. She reported physical therapy was helpful. *Id.* Dr. Hartsock observed Plaintiff to have full ROM of her left knee and left wrist, healed incisions, and an intact neurovascular examination. *Id.* He indicated he would renew Plaintiff's physical therapy for another four weeks and expected that "she should be able to return to work full duty without restrictions." *Id.*

On June 19, 2014, Plaintiff complained of a headache that had lasted for three days and was not relieved by over-the-counter medications. Tr. at 456. She indicated she had experienced a similar headache two months earlier. *Id.* Eric G. Lloyd, P.A. ("Mr. Lloyd"), prescribed Fioricet for headaches and Promethazine for nausea. Tr. at 456–57.

11

Plaintiff presented to physical therapy for her left wrist and hand on June 24, 2014. Tr. at 486. She was discharged from physical therapy on July 1, 2014, because of lower extremity pain. Tr. at 487. The discharge summary indicates Plaintiff had participated in six treatments and had missed four appointments. *Id.*

On August 25, 2014, Dr. Booth administered several tests and prepared a comprehensive report of his findings. Tr. at 477–82. Plaintiff reported sadness, difficulty falling asleep and staying asleep, feelings of guilt and worthlessness, low energy, difficulty focusing, becoming easily upset and irritable with family members, crying spells, anxiety, worry, panic attacks, recurrent and intrusive memories, traumatic nightmares, distorted and negative beliefs about the world, markedly diminished interest in activities, hypervigilance, and social impairment. Tr. at 477–78. She indicated she did not go out often because she did not like being in a car and had no interest in interacting with others. Tr. at 479. Dr. Booth observed that Plaintiff frequently moved to alleviate pain. *Id.* He noted Plaintiff was dressed casually, had normal grooming, and maintained appropriate eye contact. *Id.* He indicated Plaintiff had normal motor activity and no abnormal movements. *Id.* He stated Plaintiff's speech was normal and her articulation was clear. *Id.* He described Plaintiff's affect as "restricted, but appropriate to the content of her speech and circumstances." *Id.* Plaintiff described her mood as "anxious." *Id.* She denied suicidal and homicidal ideations, intent, or plan. *Id.* Her thought content was focused on her depression, physical limitations, MVA, and pending litigation. *Id.* She denied auditory and visual hallucinations, and Dr. Booth indicated he elicited no delusions. *Id.* Dr. Booth described Plaintiff as being of average intelligence. *Id.* He stated

she was oriented to person, place, time, and situation. *Id.* He noted Plaintiff's memory was intact to remote recall, but that she had impaired immediate and recent recall. *Id.* He stated Plaintiff had an adequate fund of knowledge and intact attention, concentration, abstraction ability, judgment, and insight. *Id.* Dr. Booth administered the Shipley Institute of Living Scales-2 ("SILS-2") and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). Tr. at 479–482. He indicated SILS-2 testing yielded an implied intelligence quotient ("IQ") score of 112, which was slightly above average. Tr. at 480. He stated Plaintiff scored in the 66th percentile for abstraction ability, which originates in the right hemisphere of the brain, but in the 27th percentile for vocabulary, which originates in the left hemisphere of the brain. *Id.* In light of Plaintiff's education and work history, Dr. Booth indicated he "must assume that she sustained damage to the left side of her brain, where vocabulary is formulated." *Id.* He stated MMPI-2 testing showed Plaintiff to be anxious, nervous, tense, and depressed. Tr. at 481. He indicated that individuals with the results obtained by Plaintiff tended to worry excessively; be vulnerable to real and imagined threats; anticipate problems before they occurred; overreact to minor stressors; and exhibit somatic symptoms. *Id.* He noted individuals with Plaintiff's profile tended to show symptoms of clinical depression that included weight loss, slow personality tempo, and slowed thought processes. *Id.* He stated such individuals were "extremely pessimistic about the world in general and more specifically about the likelihood of overcoming their problems." *Id.* He stated individuals with Plaintiff's profile tended to be docile and passive-dependent in relationships. *Id.* He described individuals with Plaintiff's profile as having a strong need for achievement and for recognition of their accomplishments. *Id.*

He stated individuals with Plaintiff's profile tended to be motivated for psychotherapy, but were likely to remain in treatment for longer than many patients. *Id.* He indicated individuals with Plaintiff's profile typically improved with treatment. Tr. at 482. He diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") and panic disorder with agoraphobia. *Id.* Dr. Booth described Plaintiff as remaining "in a state of heightened anxiety that is punctuated by unexpected panic attacks." *Id.* He indicated Plaintiff had "withdrawn from life and essentially resides in her bedroom." *Id.* He stated her thinking was erratic and her moods were unpredictable. *Id.* He indicated Plaintiff was unable to drive and had difficulty performing daily activities. *Id.* He stated the following: "In my professional opinion, Ms. Jenkins will not be able to function at her previous level either physically or intellectually. In short, she should be categorized as disabled." *Id.*

Plaintiff complained of recurrent headaches on September 18, 2014. Tr. at 492. She stated she had experienced a couple of headaches over the prior few months. *Id.* She stated Fioricet was effective, but she was only able to obtain a few pills at a time because of their expense. *Id.* She reported chronic memory loss and left wrist pain. *Id.* Dr. Ackermann observed Plaintiff to resist extension of her left wrist and to demonstrate pain over her left extensor hallucis tendon. *Id.* He prescribed Bupap for Plaintiff's headaches and instructed her to use Aleve or Ibuprofen, ice, and a wrist brace for left wrist pain. Tr. at 492–93. He refilled Promethazine for nausea, but discontinued Plaintiff's other medications. Tr. at 493.

Plaintiff complained of left wrist pain on October 9, 2014. Tr. at 489. Nathan Averill, M.D. ("Dr. Averill"), indicated Plaintiff's left wrist pain was tendinitis and

advised her to take Aleve or Ibuprofen and to use ice and a wrist brace. *Id.* He referred

Plaintiff for additional physical therapy for her left wrist on October 14, 2014. Tr. at 490.

      C.     The Administrative Proceedings

            1.     The Administrative Hearing

                  a.     Plaintiff's Testimony

At the hearing on October 16, 2014, Plaintiff testified she lived with her eight-,

11-, and 14-year-old children. Tr. at 38–39. She stated she last worked in collections for

DirecTV. Tr. at 39. She indicated she was injured in a car accident and was unable to

return to her job within the medical leave period. Tr. at 40.

Plaintiff indicated she experienced swelling in her ankle if she stood for too long.

Tr. at 47. She stated her knee locked up if she sat for longer than 20 to 30 minutes. *Id.*

She indicated she had lost her balance and had sustained a couple of falls. Tr. at 54. She

estimated she could stand for no longer than three to four hours during the day. Tr. at 47.

She testified she could walk for 45 minutes to an hour at a time. *Id.* She stated she

elevated her leg four times a day for 30 to 45 minutes at a time to reduce swelling in her

ankle. Tr. at 55.

Plaintiff described pain that occurred when she bent or touched her wrist. Tr. at

48. She indicated she was no longer able to braid her daughters' hair. *Id.* She stated she

had dropped pots and broken dishes and that her left hand became fatigued when she

washed dishes. Tr. at 48–49. She indicated she practiced her typing skills, but that her

typing speed had declined. Tr. at 49.

Plaintiff stated her memory was impaired and that she had difficulty focusing. Tr. at 50. She testified she had been seeing Dr. Booth once a week. Tr. at 49.

Plaintiff indicated she experienced one to three headaches per month that would last for a day or two. Tr. at 52. She stated she had once required an injection to get rid of a headache. *Id.* She denied having headaches before the accident and stated she had not been evaluated by a physician for a possible head injury. Tr. at 52–53.

She testified she continued to participate in physical therapy, but sometimes had difficulty obtaining transportation to appointments. Tr. at 44. She indicated she had not had a car of her own since the accident and had to borrow cars and rely on family members for transportation. Tr. at 44–45. Plaintiff indicated she was able to drive, but felt "jumpy." Tr. at 50. She stated her children rode the school bus, but that she sometimes had to pick them up from school or drive them to sporting events. *Id.* She indicated she drove to Walmart, Bi-Lo, and the post office, as well. Tr. at 51. She testified she only drove locally and did not drive to Charleston or to areas with heavy traffic. Tr. at 50.

Plaintiff testified that she assisted her children in getting ready each morning. Tr. at 53. She indicated she would make their beds and clean their rooms after they left for school. *Id.* She stated she would prepare her breakfast and sit to watch the news after her children left. *Id.* She indicated she would prepare her children's lunches for the next day and do laundry. Tr. at 54. She testified that household chores took longer than they had in the past. *Id.* She stated her mother would come over two or three times per week to prepare dinner for her and her children. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing. Tr. at 56–61. The VE categorized Plaintiff's PRW as a customer service representative, *Dictionary of Occupational Titles* ("*DOT*") number 239.362-014, as sedentary with a specific vocational preparation ("SVP") of five; a social services interviewer, *DOT* number 205.567-014, as sedentary with an SVP of four; and a daycare worker, *DOT* number 359.677-018, as light with an SVP of four. Tr. at 56. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; could frequently push and pull with the left non-dominant arm; could frequently operate foot controls with the left leg; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, crouch, kneel, and crawl; could frequently handle objects with the left hand; and should avoid all exposure to unprotected heights. Tr. at 56–57. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a customer service representative and an interviewer. Tr. at 57.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who had the same limitations specified in the first hypothetical question, but was limited to simple, routine, repetitive tasks in a low stress work environment, which he defined as "having only occasional changes in the work setting." *Id.* The ALJ asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE stated she could not. *Id.* The ALJ asked the VE to identify other jobs in the regional and national economy that the individual could perform. *Id.* The VE cited jobs as a stock and inventory clerk, *DOT* number 221.587-018, with 1,300 positions in South Carolina and 79,000 positions in the

national economy; an office aide, *DOT* number 239.589-010, with 450 positions in South Carolina and 44,000 positions in the national economy; and a records clerk, *DOT* number 215.563-010, with 150 positions in South Carolina and 17,000 positions in the national economy. Tr. at 57–58.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who was able to perform sedentary work; could frequently push and pull with the left upper extremity; could frequently use her left foot to operate controls; could not climb ladders, ropes, or scaffolds; could occasional climb ramps or stairs, stoop, crouch, kneel, and crawl; could frequently handle with her left non-dominant hand; and should avoid all exposure to unprotected heights. Tr. at 58. He asked if the hypothetical individual could perform Plaintiff's PRW. *Id.* The VE testified the individual could perform jobs as a customer service representative and an interviewer. *Id.*

The ALJ asked the VE to consider the same limitations in the previous question, but to further assume the individual would be limited to simple, routine, repetitive tasks in a low stress environment. *Id.* He asked if there would be jobs available. *Id.* The VE testified that Plaintiff's PRW would be excluded, but that the individual could perform jobs as a charge account clerk, *DOT* number 205.367-014, with 250 positions in South Carolina and 23,000 positions in the national economy; an administrative support clerk, *DOT* number 249.587-014, with 450 positions in South Carolina and 44,000 positions in the national economy; and a quality control examiner, *DOT* number 739.687-182, with 450 positions in South Carolina and 14,000 positions in the national economy. Tr. at 58–59.

The ALJ asked the VE if the hypothetical individual could perform the identified jobs if she were limited to occasional manipulation with the hands. Tr. at 59. The VE indicated sedentary work generally required "very good if not unimpeded use of the dominant hand" and "fairly good use of a helper hand." *Id.* He asked if there would be jobs available if the individual were to be off task for more than two hours a day because of pain. *Id.* The VE stated the individual would be unable to maintain work "if that were happening on a continuing basis." *Id.* The ALJ asked if there would be jobs available if the individual were to miss more than two days of work per month on a regular basis. *Id.* The VE indicated there would be no jobs. *Id.*

Plaintiff's attorney asked the VE if the jobs identified in response to the hypothetical question would be affected if the individual were required to elevate her leg four times a day for 30 minutes at a time. Tr. at 60. The VE indicated the individual would be unable to work if she had to elevate her leg at hip-height on a regular basis. *Id.*

Plaintiff's attorney asked the VE if the hypothetical individual could perform any of the identified jobs if she were limited to occasional handling and fingering. Tr. at 61. The VE stated the individual could not perform Plaintiff's PRW and would have no transferable skills. *Id.*

> 2.      The ALJ's Findings

In his decision dated November 17, 2014, the ALJ made the following findings of fact and conclusions of law:

> 1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.     The claimant has not engaged in substantial gainful activity since January 21, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: status/post motor vehicle accident with left radius fracture and left tibial plateau fracture requiring open reduction and internal fixation (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently push and pull with the left non-dominant arm. She can frequently push/pull with the left lower extremity for foot controls. Furthermore, she can never climb ladders/ropes/scaffolds and occasionally climb ramps/stairs. She can occasionally stoop, kneel, crouch, and crawl. She can frequently handle objects with the left non-dominant hand and must avoid exposure to unprotected heights. The claimant is also limited to simple, routine, repetitive tasks in a low-stress job setting with only occasional changes in the work setting.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on February 27, 1965 and was 47 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 23–30.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the Commissioner did not sustain her burden to prove that Plaintiff could perform other work in the economy;

2)      the ALJ erred in relying on Dr. Hartsock's opinion to support a finding that Plaintiff's condition improved to the point that she could return to work and did not consider whether Dr. Hartsock's earlier opinions supported a closed period of disability;

3)      the ALJ did not adequately evaluate Plaintiff's subjective symptoms and made a conclusory credibility finding;

4)      the ALJ did not provide sufficient reasons to support his decision to reject Dr. Booth's opinion; and

5)      the ALJ's hypothetical question to the VE failed to account for all of Plaintiff's impairments and limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

    1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4)

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b) and 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Ability to Perform Other Jobs

The ALJ found that Plaintiff was unable to perform her PRW. Tr. at 29. He determined that the Medical-Vocational Guidelines did not direct a conclusion of either "disabled" or "not disabled," but that they could be used as "a framework for decisionmaking." Tr. at 29–30. He indicated Plaintiff's ability to perform all or

substantially all light work had been "impeded by additional limitations" and stated he had questioned the VE "[t]o determine the extent to which these limitations erode the unskilled light occupational base." *Id.* The ALJ then wrote the following: "The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as," but failed to identify occupations that Plaintiff could perform. *See* Tr. at 30. He then indicated he had concluded based on the VE's testimony that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*

Plaintiff argues the burden to prove that she could perform other jobs that existed in the economy shifted to the ALJ after he found that she was unable to perform her PRW. [ECF No. 19 at 26–27]. She maintains the ALJ indicated he relied on the VE's testimony to support the existence of other jobs, but failed to cite any jobs she could perform in the decision. *Id.* at 27.

The Commissioner argues the ALJ's failure to identify jobs Plaintiff could perform was "obviously a scrivener's error." [ECF No. 21 at 17]. She maintains that the ALJ stated he relied on the VE's testimony and assessed the same RFC that he presented to the VE as a hypothetical question. *Id.* at 18–19.

"The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter." 42 U.S.C.A. § 405(b)(1). Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable

to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based." *Id.*

"Through the fourth step, the burden of production and proof is on the claimant." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992), citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). "If the claimant reaches step five, the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Id.*, citing *Grant*, 699 F.2d at 191. The Commissioner carries the burden to identify jobs in the national economy that the claimant can perform. *Wilson v. Heckler*, 743 F.2d 218, 220 (4th Cir. 1984), citing *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981); *see also Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015), citing 20 C.F.R. § 404.1560(c) ("An ALJ can only find a claimant not disabled at step five of the analysis if the Commissioner proves that the claimant can perform other work that 'exists in significant numbers in the national economy.'"). Therefore, "[t]he purpose of bringing in a VE is to assist the ALJ in meeting its burden at step five of the sequential evaluation." *Davis*, 2013 WL 644261, at *7, citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

The Commissioner argues the ALJ committed a scrivener's error and refers the court to *Grimes v. Colvin*, No. 1:14-891, 2016 WL 1312031, at *10 (M.D.N.C. Mar. 31, 2016). In *Grimes*, 2016 WL 1312031, at *10, the ALJ indicated in his decision that the plaintiff had the RFC "to perform less than light work" when he meant that the plaintiff "could perform light work with some additional limitations," which he included in the

RFC assessment. The court stated it "doubt[ed] Plaintiff ha[d] identified an error," but indicated it was "at most a harmless scrivener's error that must be read in the context of the entire decision." *Id.* The undersigned considers *Grimes* unpersuasive because a review of the ALJ's entire decision fails to remedy the error.

The undersigned finds more persuasive this court's decision in *Douglas v. Astrue*, No. 1:09-1349-CMC, 2010 WL 3522298 (D.S.C. Sept. 3, 2010). In *Douglas*, a discrepancy existed between the hypothetical question posed to the VE that restricted the plaintiff to work with an SVP of one or two and the ALJ's RFC assessment that restricted her to work with an SVP of one. *Id.* at *3. The ALJ found that the Plaintiff could perform three jobs that the VE described in response to the hypothetical question as having an SVP of two. *Id.* at *3. While the Commissioner argued the difference between the two was scrivener's error in omitting the words "or 2" from the RFC assessment in the decision, the court found that the ALJ's error could not be categorized as a scrivener's error because there was "little in the decision to explain whether the ALJ intended to include SVP 2 occupations in Plaintiff's RFC." *Id.* at *4.

In the instant case, the ALJ assessed Plaintiff to have the RFC that he presented to the VE as the second hypothetical question. *Compare* Tr. at 25–26, *with* Tr. at 56–57. The VE responded that an individual with the described RFC could perform work as a stock and inventory clerk, *DOT* number 221.587-018, an office aide, *DOT* number 239.589-010, and a records clerk, *DOT* number 215.563-010. Tr. at 57–58. Although the undersigned can readily compare the ALJ's decision to the hearing transcript and see the jobs that he intended to cite in his decision, the fact remains that the decision was devoid

of evidence to satisfy the Commissioner's burden at step five. *Compare* Tr. at 57–58, *with* Tr. at 29–30. The jobs the ALJ intended to cite were contained only in the hearing transcript, which was not readily available to Plaintiff at the time she received the decision.

Because the ALJ found that Plaintiff was unable to perform her PRW (Tr. at 29) and that the Medical-Vocational Rules could not be applied directly, he had an affirmative duty to identify jobs Plaintiff could perform in order to provide a reason that supported the disability determination. *See* 20 C.F.R. § 404.1560(c) and 416.960(c); 42 U.S.C.A. § 405(b)(1). Even though the ALJ obtained vocational testimony in his effort to meet the Commissioner's burden at step five, he did not fully discharge his duties because he failed to cite jobs Plaintiff could perform in the written decision. Therefore, the undersigned recommends the court find that substantial evidence does not support the ALJ's finding that Plaintiff could perform other jobs that exist in significant numbers in the economy.

### 2.     Additional Allegations of Error

In light of the foregoing recommendation, the undersigned declines to analyze Plaintiff's remaining allegations of error. However, a review of the record shows a couple of issues that warrant particular mention. The ALJ accorded significant weight to Dr. Hartsock's June 2014 statement that Plaintiff should be able to return to work after four more weeks, but his explanation does not reflect that he considered whether Plaintiff was entitled to a closed period of disability between January 21, 2013, and July 2014. *See* Tr. at 28 (giving some weight to the February 2013, April 2013, July 2013, and March 2014

28

statements and the most weight to the June 2014 statement because it "indicates that the claimant would be able to return to work full duty after four [additional] weeks of physical therapy"). Also, as Plaintiff pointed out in her brief, the ALJ's decision does not reflect his consideration of Dr. Booth's diagnoses and test results or evidence of a treatment relationship. *See* ECF No. 19 at 19–26; *see also* Tr. at 28. The undersigned recommends that the ALJ pay particular attention to these issues on remand.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

March 2, 2017                                         Shiva V. Hodges
Columbia, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).